**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 22, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CHARLES HOW,

      Plaintiff - Appellant,

v.

CITY OF BAXTER SPRINGS,
KANSAS; DONNA WIXON, City
Clerk; ROBERT E. MYERS, City
Attorney,

      Defendants - Appellees.

No. 06-3022
(D.C. No. 04-CV-2256-JWL)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **EBEL**, and **GORSUCH**, Circuit Judges.

Plaintiff-Appellant Charles How appeals from the district court's grant of

summary judgment in favor of Defendants-Appellees Donna Wixon and Robert E.

Myers on his constitutional tort claims brought pursuant to 42 U.S.C. § 1983.

Generally, Mr. How claims that Defendants violated his First Amendment right to

free speech when they pursued a criminal defamation claim against him.  He

contends that the prosecution was in retaliation for his publication of a political

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

advertisement in a local newspaper. The district court based its grant of summary judgment on grounds that Ms. Wixon, in filing a criminal defamation complaint, was not acting "under color of state law," and that Mr. Myers was entitled to qualified immunity. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

To say the least, Mr. How was an active participant in the political process in Baxter Springs, Kansas ("the City"). During a period from April 2, 2002 to February 7, 2003, Mr. How authored at least twenty-seven letters to the editor in the Baxter Springs News, the City's local newspaper. One frequent topic of Mr. How's letters was the job performance, and often the personal life, of the local city clerk, and defendant in this action, Donna Wixon. Exemplary of Mr. How's remarks regarding Ms. Wixon are those found in an October 11, 2002 letter to the editor in which he compares Ms. Wixon's performance with that of female employees who previously worked at city hall:

> They all came in every day and did their job for our town. Never had men in the City Hall after hours, never took unnecessary trips, never stirred up hate and discontent, never rode around with city male employees, never sat in a pickup truck with their feet up on the dash for an hour and a half, never drove their vehicle to collect mileage from the City when the City could have provided a vehicle, and never, never, said anything disrespectful toward our mayors.

4 Aplt. App. at 841.

Perhaps feeling that his complaints were not being heeded, Mr. How decided to run for a position on Baxter Springs' city council. During the time of his campaign, on March 11, 2003, Mr. How ran an advertisement in the Baxter Springs News which stated:

> FOR MAYOR? Art Roberts Voted To Hire Donna Wixon & Almost Doubled Her Salary Over the Previous Clerks [sic] Pay In Three Years—Plus Bonuses. Palzy Walzy With Defeated Council Member Bob St. Clair. You Folks Want Two More Years Of This Hateful City Clerk?

4 Aplt. App. at 862.

Following a city council meeting on the evening of March 11, Ms. Wixon approached Mr. Myers, Baxter Springs' city attorney, and inquired as to her ability to file a criminal defamation complaint against Mr. How in her capacity as a private citizen. Mr. Myers informed Ms. Wixon that, as a private citizen, she could indeed file a criminal complaint against Mr. How.[1] Ms. Wixon had no further discussions on the matter with Mr. Myers until after her criminal complaint had been filed. On the evening of March 12, 2003, Ms. Wixon, on her own, prepared a "Voluntary Statement" detailing her allegations of criminal defamation against Mr. How. In the statement, Ms. Wixon alleged that Mr. How's March 11 political advertisement contained statements known to be false

---

[1] In Kansas, a private citizen can file a criminal complaint against another person in municipal court. See Kan. Stat. Ann. § 12-4202 (2005). Also, Kansas has criminalized defamation. See Kan. Stat. Ann. § 21-4004 (2004). Mr. How was charged under a city ordinance that reads the same as Kan. Stat. Ann. § 21-4004.

and made with actual malice and requested that "charges be filed against . . . Charles How individual [sic] for criminal defamation as per K.S.A. 21-4004." 4 Aplt. App. at 864. The next day, Ms. Wixon signed the voluntary statement in front of two witnesses who were also her fellow employees at the city clerk's office. On her lunch hour, Ms. Wixon gave the written statement to a police officer and requested that he file charges. Later, the municipal court clerk delivered a formal criminal complaint to Ms. Wixon, which she signed.

Ultimately, on March 13, 2003, the criminal complaint against Mr. How was filed in municipal court.[2] In relevant part, the complaint stated that, on March 11, 2003, Mr. How committed criminal defamation against Ms. Wixon by placing a political advertisement in the Baxter Springs News knowing the information contained therein to be false. See 4 Aplt. App. at 875. Upon the filing of the complaint, Mr. How was served with a notice to appear.

On April 18, 2003, the municipal court held its first hearing on the case. Although Mr. Myers, in his capacity as city attorney, made an initial appearance on behalf of the City, he immediately recused himself so as to avoid any potential conflict of interest (apparently, Mr. How had also been critical of Mr. Myers in the past). After entering Mr. How's not guilty plea, the municipal court informed Mr. Myers that the City had thirty days to obtain a special prosecutor to

_____

[2] Charges were also filed against Ronald Thomas, another citizen who had written letters regarding Ms. Wixon, and Larry Hiatt, publisher of the Baxter Springs News. Neither Mr. Thomas nor Mr. Hiatt are parties to this appeal.

- 4 -

refile the defamation charges.

Because the City failed to find a special prosecutor within the time allotted, the municipal court dismissed the complaint without prejudice. On June 11, 2003, an article in the Joplin Globe, another local newspaper, reported that Mr. Myers claimed to have obtained a special prosecutor willing to refile the charges. He confesses being accurately quoted as stating, "[T]his [special] prosecutor will refile the complaints." The district court assumed that, viewed in the light most favorable to Mr. How, Mr. Myers' statement was false—he had not obtained a special prosecutor at that time and, in fact, he never obtained one. The charges against Mr. How were never refiled.

On June 2, 2004, Mr. How filed his complaint in federal district court, seeking damages under 42 U.S.C. § 1983 against Ms. Wixon, Mr. Myers, and the City for alleged violations of his First Amendment right to free speech. Mr. How's complaint also sought relief pursuant to various state law causes of action. Following extensive discovery, Defendants moved for summary judgment on all of Mr. How's claims. Mr. How also moved for summary judgment arguing that his political advertisement was protected speech as a matter of law. On December 15, 2005, the district court granted Defendants' motions for summary judgment as to Mr. How's § 1983 claims and declined to exercise supplemental jurisdiction over Mr. How's remaining state law claims. See How v. City of Baxter Springs, No. 04-2256, 2005 WL 3447702, at *1 (D. Kan. Dec. 15, 2005).

In so holding, the district court determined that Ms. Wixon's filing of a defamation claim, as a private citizen, was not made "under color of state law" and that she could not be held liable under § 1983. See id. at *5-9. The district court further determined that Mr. Myers was entitled to qualified immunity based on the absence of a constitutional violation, as well as the law not being clearly established. See id. at *9-11. Finding no underlying constitutional violation, the district court apparently determined that Mr. How's § 1983 claim against the City could not proceed. Finally, the district court denied Mr. How's motion for summary judgment as moot and dismissed the action in its entirety. See id. at *1 n.1, *12.

On appeal, Mr. How argues that: (1) the district court should have decided that his political advertisement was protected speech; (2) Ms. Wixon's actions were taken "under color of state law" because (a) in causing Mr. How to be prosecuted, she abused her power as a public official, and (b) Ms. Wixon and Mr. Myers acted jointly to bring about Mr. How's prosecution; and (3) Mr. Myers is not entitled to qualified immunity because (a) in lying to the Joplin Globe, Mr. Myers kept "the threat of future prosecutions alive" in order to prevent him from exercising his First Amendment free speech rights, and (b) the law was clearly established, at the time, that Mr. Myers' actions violated Mr. How's constitutional rights.

Discussion

We review the district court's grant of summary judgment de novo, employing the same legal standard as the district court. Green v. Bd. of County Commr's, 472 F.3d 794, 797 (10th Cir. 2007). That is, summary judgment is appropriate where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In his first issue, Mr. How requests that we revisit the district court's decision on the denial of his motion for summary judgment on whether his political advertisement was protected speech. The district court denied the motion on the grounds that, given its resolution of other issues, it was moot and because genuine issues of material fact remained. Of course, we lack jurisdiction over the denial of summary judgment based on remaining issues of fact, Smith v. Diffee Ford-Lincoln, Mercury, Inc., 298 F.3d 955, 966 (10th Cir. 2002), but we too conclude that the first issue is moot based on our resolution of the other issues.

I.    Mr. How's § 1983 Claim Against Ms. Wixon

Ms. Wixon contends that she may not be held liable for filing criminal defamation charges against Mr. How because, in so doing, she was acting in a private capacity and not "under color of state law." Because it is a mixed question of law and fact, we review the district court's state action determination de novo. Duke v. Smith, 13 F.3d 388, 392 (11th Cir. 1994) (citing Albright v. Longview Police Dept., 884 F.2d 835, 838 (5th Cir. 1989)); see also Van Scoten

v. C.I.R., 439 F.3d 1243, 1252 (10th Cir. 2006).

To state a claim under 42 U.S.C. § 1983, a plaintiff must show that he was deprived of a right "secured by the Constitution or laws of the United States" and that the deprivation was committed by an individual acting "under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999). "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." Id. at 50 (quoting Blum v. Yaretsky, 457 U.S. 991, 1002 (1982)) (internal quotations omitted).

In most circumstances, including the one present in this case,[3] the concepts of state action and under the color of state law are coterminous. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 929 (1982) ("[I]n a § 1983 action brought

_____

[3] In Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982), the Supreme Court explained that where state action is present there is also necessarily action taken under color of state law for purposes of § 1983 liability. See id. at 935. The Court also explained that the converse is not always necessarily true. See id. at 935 n.18. In other words, there may be instances where state action is not present but an individual nonetheless acts under color of state law for purposes of liability under § 1983. This phenomenon derives from the fact that "§ 1983 is applicable to other constitutional provisions and statutory provisions that contain no state-action requirement." Id. The First Amendment, however, requires state action, see Hudgens v. NLRB, 424 U.S. 507, 513 (1976) ("It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state."), and Mr. How may not circumvent that requirement by bringing an action under § 1983. Thus, in order to determine whether Ms. Wixon acted "under color of state law" such that she may be held personally liable under § 1983, we must determine whether her actions may "be fairly attributed to the State." Lugar, 457 U.S. at 937.

against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement . . . are identical."); Georgia v. McCollum, 505 U.S. 42, 53 n.9 (1992). While the dichotomy between private conduct and state action "is well established and easily stated, the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer." Jackson v. Metro. Edison Co., 419 U.S. 345, 349-50 (1974). To occur under color of state law, the deprivation of a federal right "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible" and "the party charged with the deprivation must be a person who may fairly be said to be a state actor . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." Lugar, 457 U.S. at 937; see also Yanaki v. Iomed, Inc., 415 F.3d 1204, 1207-08 (10th Cir. 2005).

The primary dispute in this case revolves around whether Ms. Wixon, in filing a criminal defamation complaint, was "a person who may fairly be said to be a state actor." The Supreme Court has explained that "in determining whether a particular action or course of conduct is governmental in character, it is relevant to examine . . . the extent to which the actor relies on governmental assistance and benefits, whether the actor is performing a traditional governmental function, and whether the injury caused is aggravated in a unique way by the incidents of

governmental authority."  Edmonson v. Leesville Concrete Co., 500 U.S. 614, 621-22 (1991) (internal citations omitted).  Mr. How contends that Ms. Wixon's actions were governmental in character because, in filing the criminal defamation complaint against him, Ms. Wixon abused her authority as city clerk and, alternatively, because Ms. Wixon and Mr. Myers, a city official, acted jointly to bring about Mr. How's prosecution and threaten him with future prosecutions. Both of Mr. How's arguments will be considered, and ultimately rejected, in turn.

A.  Badge of Authority

Mr. How first argues that Ms. Wixon, in filing a criminal defamation complaint against him, abused her authority as city clerk and thus her action may fairly be attributed to the State.  The district court held that Ms. Wixon's filing of a criminal defamation complaint was done in her personal capacity and was not related to her official duties as city clerk.  The district court reasoned that the fact that Ms. Wixon was criticized primarily for the performance of her duties as city clerk did not imbue her criminal complaint with state action.  We agree.

Traditionally, in order to act under color of state law, a defendant must have "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  Although "state employment is generally sufficient to render the defendant a state actor," Lugar, 457 U.S. at 935, "that a tort was committed by an

- 10 -

individual employed by the state does not, _ipso facto_, warrant attributing all of the employee's actions to the state," Jojola v. Chavez, 55 F.3d 488, 493 (10th Cir. 1995). Thus, "it is the plaintiff's burden to plead, and ultimately establish, the existence of a 'real nexus' between the defendant's conduct and the defendant's 'badge' of state authority in order to demonstrate action was taken 'under color of state law.'" Id. at 494.

In this case, Mr. How has failed to establish a "real nexus" between Ms. Wixon's filing of her criminal defamation complaint and her position as city clerk. Rather, the evidence, viewed in the light most favorable to Mr. How, indicates that Ms. Wixon filed her criminal defamation complaint as a private citizen. As noted in the recitation of facts, nothing suggests that the process Ms. Wixon undertook in filing her complaint differed from that of an ordinary citizen.

In attempting to establish state action, Mr. How first points to the fact that the publication for which Mr. How was prosecuted exclusively concerned Ms. Wixon's conduct as city clerk.[4] Although the content of the publication may have some bearing on the question of whether a particular reaction to the publication constitutes state action, see Rossignol v. Voorhaar, 316 F.3d 516, 524 (4th Cir. 2003), we do not think that is the dispositive inquiry. The fact that Mr. How's publication concerned Ms. Wixon's duties as city clerk would have undoubtedly

---

[4] We have some doubt whether this is even true, but for argument's sake we will assume it is.

affected the State's ability to hold Mr. How liable for the publication. See New York Times v. Sullivan, 376 U.S. 254, 279-80 (1964). For purposes of determining the existence of state action, however, the nature of her actions in response to the publication, rather than the content of the publication itself, is the critical inquiry. In other words, whether Ms. Wixon acted under color of state law turns on whether her reaction to the publication was undertaken in the capacity of a private citizen or was undertaken with a badge of state authority. And, as previously discussed, Mr. How has not shown that Ms. Wixon wore a badge of state authority when she filed her criminal complaint against him.[5]

Mr. How next maintains that state action was present because Ms. Wixon chose to employ "the weight of the state" against him. Aplt. Br. at 19. According to Mr. How, Ms. Wixon did so by causing the City to prosecute him and serve a complaint and notice to appear upon him. The same can be said, though, for any criminal complaint filed by a private party against another individual in Kansas. Congress did not, in using the term "under the color of state law," intend to subject private citizens, acting as private citizens, to a federal lawsuit whenever they seek to initiate a prosecution or seek a remedy involving the judicial system.

---

[5] This fact, then, distinguishes this case from Rossignol, upon which Mr. How heavily relies. In that case, sheriff's deputies not only retaliated against a newspaper publisher because it was highly critical of the Sheriff's fitness for office, but they also used their positions as deputies to carry out their scheme and to avoid prosecution. See Rossignol, 316 F.3d at 525-26. There is no evidence in this case that Ms. Wixon similarly used her position as city clerk to gain an advantage in the filing of her complaint.

To hold otherwise would significantly disregard one purpose of the state action requirement, which is to "preserve[] an area of individual freedom by limiting the reach of federal law and federal judicial power." Lugar, 457 U.S. at 936. Instead, in enacting § 1983, Congress intended to provide a federal cause of action primarily when the actions of private individuals are undertaken with state authority. See id. at 934. Thus, absent more, causing the state, or an arm of the state, to initiate a prosecution or serve process is insufficient to give rise to state action.[6]

Mr. How also claims that state action was present because Ms. Wixon's alleged purpose for filing her criminal complaint was "solely to silence him, to deprive him of his First Amendment rights." Aplt. Br. at 19. The record is controverted on that point. See 3 Aplt. App. at 501 ("I was willing to try anything if they would just stop or at least have to answer and write the truth."), id. at 534 ("I just wanted them to stop writing the personal things about me. If they wanted to write about work, I had no problem with that."). Regardless, this point, while perhaps relevant to the merits of Mr. How's First Amendment claim,

_____

[6] Mr. How cites our decision in Yanaki, 415 F.3d at 1210 n.11, for the proposition that state action is present when one employs "the weight of the state." Aplt. Br. at 19. We used that language, however, only in the context of distinguishing the facts in Yanaki from those in the Ninth Circuit's decision in Howerton v. Gabica, 708 F.2d 380 (9th Cir. 1983). The facts of this case are similarly distinguishable from those found in Howerton. See 708 F.2d at 384 & n.9 (noting that "[p]olice were on the scene at each step of the eviction" and "actively intervened" at the request of the private defendants and on the initiative of one of the officers).

- 13 -

has no bearing on whether Ms. Wixon's filing of a criminal complaint is fairly attributable to the State.

Mr. How also makes much of the fact that the two witnesses who signed Ms. Wixon's voluntary statement were employees of the city clerk's office. We fail to see, and Mr. How fails to explain, how the fact that Ms. Wixon had her coworkers serve as witnesses suddenly transforms her filing of a criminal complaint into state action. Having one's co-workers witness the signing of a legal document is not a rare occurrence. Moreover, there is no evidence that the signatures were even needed to file a formal criminal complaint or that Ms. Wixon, being unable to find other individuals to serve as witnesses, used her power as city clerk to conscript two subordinates into being witnesses. As a result, the fact that two employees of the city clerk's office signed Ms. Wixon's voluntary statement does not give rise to state action.

Next, Mr. How maintains that Ms. Wixon's statement to the Joplin Globe, after the charges against Mr. How had been dropped, that "the city will have to pay a special prosecutor . . .," and the fact that the City reimbursed Ms. Wixon for travel expenses to attend a deposition in this litigation, both demonstrate state action. We disagree. Where state action is concerned, the proper inquiry is whether, at the time of the alleged constitutional violation, the defendant was a state actor. See Kottmyer v. Maas, 436 F.3d 684, 688 (6th Cir. 2006) ("These allegations are insufficient to establish that [defendants] were state actors at the

time of the alleged constitutional violations.") (emphasis added). Here, Ms. Wixon is alleged to have violated Mr. How's constitutional rights when she filed a criminal defamation complaint, causing the City to pursue criminal charges against him. Ms. Wixon's statement to the Joplin Globe and her reimbursement, however, both occurred after she filed her criminal complaint (in fact, after her complaint was dismissed), and those occurrences therefore have no effect on whether she was a state actor at the time her criminal complaint was filed and acted upon—in other words, at the time the alleged constitutional violation is to have taken place.

Finally, Mr. How argues that Kansas law requires the city attorney to issue a notice to appear and the fact that Mr. Myers denies issuing such a notice in this case is strong circumstantial evidence that Ms. Wixon "abused the authority of her public office by causing the Municipal Court Clerk to issue the Notice to Appear and by causing the police to serve that Notice with the Complaint upon plaintiff." Aplt. Br. at 22. The Kansas statute to which Mr. How refers provides:

> A copy of the complaint shall be served, together with a notice to appear or a warrant, by a law enforcement officer upon the accused person, and forthwith, the complaint shall be filed with the municipal court, except that a complaint may be filed initially with the municipal court, and if so filed, a copy of the complaint shall forthwith be delivered to the city attorney. The city attorney shall cause a notice to appear to be issued, unless he or she has good reason to believe that the accused person will not appear in response to a notice to appear, in which case the city attorney may request that a warrant be issued.

Kan. Stat. Ann. § 12-4203(a) (2003). This provision contemplates that, in most circumstances, a law enforcement officer serves the complaint and notice to appear upon the defendant and, simultaneously or thereafter, the complaint is filed with the municipal court. An exception is made where the complaint is initially filed with the municipal court, and in such a case, a copy of the complaint is delivered to the city attorney. In all cases, the city attorney causes a notice to appear to issue.

The problem for Mr. How is that he cites to no evidence whatsoever indicating that Ms. Wixon had any role in drafting the official complaint against him or that she "caused" the municipal court clerk, instead of Mr. Myers, to issue the notice to appear. Indeed, the only evidence in the record is that Ms. Wixon had no knowledge regarding either the inner-workings of the municipal court clerk's office or the identity of the individual responsible for filling out the official complaint against Mr. How. See 4 Aplt. App. at 668-69, 695. Additionally, even assuming Mr. How was able to show that Ms. Wixon's official complaint should have been delivered to Mr. Myers and that a copy never was delivered and that someone other than Mr. Myers caused the notice to appear to issue, Mr. How has cited to no evidence from which a reasonable jury could find that these irregularities came about because Ms. Wixon acted under color of state law. Consequently, Mr. How's attempt to rely on an abuse of authority theory to establish state action fails.

- 16 -

B.  Joint Action

Mr. How alternatively relies on a joint action theory to establish state action.  He argues abundant evidence, circumstantial or otherwise, tends to show that Ms. Wixon and Mr. Myers together engaged in a particular course of action to violate Mr. How's constitutional rights.  He claims that, at the very least, Mr. Myers acquiesced in Ms. Wixon's use of his prosecutorial power and that, alone, is enough to establish state action.

Mr. How is correct that private parties may be considered state actors where they are "willful participant[s] in joint action with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 27 (1980).  Nevertheless, we may not find joint action based alone on "the mere acquiescence of a state official in the actions of a private party," see Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1453 (10th Cir. 1995) (citing Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 164 (1978)); instead, we "examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights," Id.  In applying this test, courts have taken two approaches.  Some courts employ a "conspiracy approach" pursuant to which "state action may be found if a state actor has participated in or influenced the challenged decision or action." Id. at 1454.  Other courts "hold that, if there is a substantial degree of cooperative action between state and private officials, or if there is overt and significant state participation in carrying out the deprivation of the plaintiff's constitutional rights,

state action is present." Id. Mr. How cannot prevail under either approach.

Mr. How contends that Ms. Wixon should be deemed to have acted under color of state law because "Ms. Wixon and [Mr.] Myers acted jointly to bring about [Mr. How's criminal defamation] prosecutions and to threaten [Mr. How] with future prosecutions on those and possibly other charges . . . ." Aplt. Br. at 17-18. Mr. How has failed to adduce any evidence, however, that Mr. Myers participated in Ms. Wixon's decision to file charges against Mr. How or that the two acted in concert to threaten Mr. How with future prosecution.

First, there is absolutely no evidence that Mr. Myers played any role in Ms. Wixon's ultimate decision to file a criminal complaint against Mr. How. The evidence instead demonstrates that Ms. Wixon simply inquired of Mr. Myers whether, despite the fact that she was city clerk, she had the ability to file a criminal defamation complaint against Mr. How in her personal capacity. Mr. Myers simply informed her that she did have that ability. After that, Mr. Myers had no role in the case until after the formal complaint had been filed. As the district court correctly noted, "Mr. Myers did not draft the complaint, file the complaint, pursue the complaint, establish probable cause for the complaint, or do anything with Ms. Wixon's criminal complaint other than recuse himself at the first chance he could do so." How, 2005 WL 3447702, at *8. And despite Mr. How's contention otherwise, Mr. Myers' mere acquiescence in Ms. Wixon's "use of his prosecutorial authority," Aplt. Br. at 27, is insufficient to give rise to state

action.  The evidence relied upon by Mr. How does not even remotely support a conclusion that Ms. Wixon and Mr. Myers shared a specific goal of stopping Mr. How from criticizing them.[7]  Mr. How also latches on to the fact that the district court stated, in its order, that "Ms. Wixon and Mr. Myers shared a common goal . . . ."  How, 2005 WL 3447702, at *8.  Viewed in context, the common goal to which the district court refers is the same common goal shared between a private citizen and a prosecutor whenever a private citizen presses criminal charges against another—the goal of successfully prosecuting the accused.  But that common goal is insufficient for a private citizen, here Ms. Wixon, to be considered a state actor.

There is also insufficient evidence to show that Mr. Myers' statements to the press regarding his effort to locate another special prosecutor were part of a concerted effort to violate Mr. How's constitutional rights.  Mr. How has presented no evidence that Ms. Wixon had any role whatsoever in Mr. Myers' statement to the Joplin Globe to the effect that he had found a special prosecutor who would be refiling charges.  Also, the fact that, in the same newspaper article, both Mr. Myers and Ms. Wixon discussed a possible civil lawsuit against Mr. How is not enough, in and of itself, to show joint action.  In sum, the evidence

_____

[7]  The only evidence relied upon that even involves or mentions Mr. Myers is Mr. Myers' own deposition testimony in which he states that the conduct of the three individuals who were prosecuted "was always related."  6 Aplt. App. at 1375.  This vague statement is insufficient to prove that Mr. Myers had a goal of stopping Mr. How from criticizing him.

- 19 -

does not support joint action. See Hammond v. Bales, 843 F.2d 1320, 1323 (10th Cir. 1988) (conclusory allegations will not suffice to establish conspiracy involving state action). Because Mr. How cannot establish that Ms. Wixon acted under color of state law, the district court correctly granted summary judgement in her favor.

II.    Mr. How's § 1983 Claim Against Mr. Myers

Mr. How also asserts a claim under § 1983 against Mr. Myers, alleging that he took actions in his role as city attorney that were solely intended to stifle the exercise of Mr. How's First Amendment rights and to intimidate him from exercising his First Amendment rights in the future. Mr. Myers responds that none of his actions were in violation of Mr. How's First Amendment rights and that nonetheless he is entitled to qualified immunity.

While it is somewhat unclear which of Mr. Myers' actions are alleged to have violated Mr. How's constitutional rights, to the extent that Mr. How is seeking to impose liability upon Mr. Myers for the filing of the complaint against him or any other activity Mr. Myers undertook in connection with the presentation of the State's case, Mr. Myers is shielded by absolute prosecutorial immunity. See Imbler v. Pachtman, 424 U.S. 409, 431 (1976) ("We hold . . . that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983."). It appears, however, that Mr. How primarily takes issue with Mr. Myers' statements to the Joplin Globe,

which appeared in an article published on June 11, 2003. That article stated:

> Myers said he is certain the attorney he has found will take the case. He declined to identify the attorney by name. "This prosecutor will refile the complaints," Myers said.
>
> . . .
>
> "There could be additional charges filed, based on other acts and other things said and done," Myers said.
>
> Myers said the defendants also may appear in civil court.

4 Aplt. App. at 909.

Although the actions of prosecutors taken within the scope of prosecutorial duties are entitled to absolute immunity, "a prosecutor is only entitled to qualified immunity when acting in an administrative or investigative capacity." England v. Hendricks, 880 F.2d 281, 285 (10th Cir. 1989). A prosecutor's statements to the press, not made as an advocate, are considered an administrative function entitling the prosecutor to, at most, qualified immunity. Id. Because Mr. Myers' statements to the Joplin Globe were not made as an advocate, we must determine whether he is entitled to qualified immunity.

"The doctrine of qualified immunity shields public officials . . . from damage actions unless their conduct was unreasonable in light of clearly established law." Elder v. Holloway, 510 U.S. 510, 512 (1994). Once a government official asserts qualified immunity as a defense, the plaintiff must show: (1) that the defendant's actions violated a constitutional or statutory right, and (2) that the rights alleged to be violated were clearly established at the time of the conduct at issue. Saucier v. Katz, 533 U.S. 194, 201 (2001); Anderson v.

- 21 -

Blake, 469 F.3d 910, 913 (10th Cir. 2006). As a result, if the plaintiff fails to demonstrate the government official's conduct violated federal law, the court need not determine whether the law was clearly established. Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993).

Government retaliation, though not expressly mentioned in the Constitution, is nonetheless actionable in as much as retaliatory actions tend to chill individuals' exercise of constitutional rights. Perez v. Ellington, 421 F.3d 1128, 1131 (10th Cir. 2005); see also Perry v. Sindermann, 408 U.S. 593, 597 (1972). In the First Amendment context, "any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000). A successful claim for First Amendment retaliation requires proof of the following elements: (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. Id.

Whether the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that

activity is an objective standard. See Eaton v. Meneley, 379 F.3d 949, 954 (10th Cir. 2004). Additionally, the standard is a rigorous one to satisfy. Id. at 955. "Thus, although the objective standard permits a plaintiff who perseveres despite governmental interference to bring suit, 'a trivial or de minimis injury will not support a retaliatory prosecution claim.'" Id. at 954-55 (quoting Poole v. County of Otero, 271 F.3d 955, 960 (10th Cir. 2001)).

Here, Mr. Myers is entitled to qualified immunity because Mr. How has not produced evidence that the complained of statement caused him to suffer an injury, let alone one that would chill a person of ordinary firmness from continuing to exercise his constitutional rights. See Laird v. Tatum, 408 U.S. 1, 13 (1972). Mr. Myers' statements claiming both to have found another attorney willing to try the case and that there was the possibility of additional charges being filed, is insufficient, standing alone, to show any injury. Because the complaint against him was dismissed without prejudice, at the time Mr. Myers' statements were made, Mr. How was already well aware that the City, at any time, could find a special prosecutor to again pursue the criminal defamation complaint against him. Any additional injury caused by Mr. Myers' acknowledgment that he had located a special prosecutor, even if assumed false, was marginal at best. As noted, however, de minimis injuries are not actionable. See Eaton, 379 F.3d at 954-55. The evidence suggests that Mr. Myers' statements had no effect on Mr. How's continuing ability to express his views publicly or to further criticize

either Ms. Wixon or Mr. Myers. See Phelan v. Laramie County Cmty. Coll. Bd. of Trs., 235 F.3d 1243, 1248 (10th Cir. 2000). And, finally, in determining whether Mr. How suffered injury, we simply cannot ignore the fact that he made light of the criminal charges filed against him, 4 Aplt. App. 883, and continued to exercise his First Amendment rights thereafter by publishing two more political advertisements criticizing Ms. Wixon, id. at 885, 890, and running a general political advertisement in support of his campaign for city councilman, id. at 892. See Smith v. Plati, 258 F.3d 1167, 1177 (10th Cir. 2001) (explaining that the fact the plaintiff persisted in the face of allegedly retaliatory actions offered some evidence that the defendant's action did not infringe upon speech). Given that Mr. How has failed to show that he suffered more than a de minimis injury at the hands of Mr. Myers, he also cannot show that his constitutional rights were violated,[8] and thus the district court was correct in holding that Mr. Myers is entitled to qualified immunity. Thus, we need not decide whether the law was

---

[8] Because Ms. Wixon was not a state actor and Mr. Myers did not violate Mr. How's constitutional rights, there is no basis with which to hold the City liable under Monell v. Department of Social Services, 436 U.S. 658 (1978). See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam) (in the absence of a constitutional violation by the individual defendants, municipal liability claim is foreclosed); Jiron v. City of Lakewood, 392 F.3d 410, 419 n.8 (10th Cir. 2004).

clearly established.  <u>See</u> <u>Hinton</u>, 997 F.2d at 782.

AFFIRMED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge